[S.F. No. 24242. June 10, 1982.]

RICHARD D. KEATING et al., Petitioners, v.
THE SUPERIOR COURT OF ALAMEDA COUNTY, Respondent;
SOUTHLAND CORPORATION et al., Real Parties in Interest.

EDWARD J. GOUVEIA et al., Plaintiffs and Respondents, v.
SOUTHLAND CORPORATION et al., Defendants and Appellants.

[And 7 other cases.]*

*Cheng v. Southland Corporation; Newell v. Southland Corporation; Sampson v. Southland Corporation; Battersby v. Southland Corporation; Keating v. Southland Corporation; Coy v. Southland Corporation; Scovis v. Southland Corporation.

COUNSEL

McKenna, Conner & Cuneo, McKenna & Fitting, Aaron M. Peck, Charles G. Miller, Martin H. Kresse, Susan L. Carroll, Arnold & Porter, Peter K. Bleakley, Mark J. Spooner and Peter R. Maier for Defendants and Appellants and Real Parties in Interest.

Robert M. Brown, Brown & Finney, Brown, Joseph & Finney, Linda R. Joseph, John F. Banker, Banker & Linderman, John F. Wells, Lise A. Pearlman, Fonda Karelitz, D. Barratt Irwin, Stark, Stewart & Simon and Stark, Stewart, Simon & Sparrowe for Plaintiffs and Respondents and Petitioners.

No appearance for Respondent.

OPINION

GRODIN, J.*—These coordinated cases arise out of disputes between Southland Corporation (Southland), owner and franchisor of 7-Eleven convenience food store operations throughout the country, and persons who are, or were, franchised operators of 7-Eleven stores in California. The issues before us do not concern the merits of those disputes, but rather the forum and procedure for their resolution. Southland contends that the disputes should be submitted to arbitration on an individual (i.e., franchisee-by-franchisee) basis, pursuant to an arbitration provision contained in its agreement with each franchisee. The franchisees, who have sued Southland[1] in both individual and class actions on a vari-

---

*Assigned by the Chairperson of the Judicial Council.

[1]The suits also named certain corporate officers as defendants, but as the parties do not distinguish them with respect to the issues presented here, we shall use the term Southland to include both the corporation and its officers.

ety of grounds, and who are all represented by the same law firm, contend alternatively that the arbitration provisions are not enforceable on adhesion grounds; that insofar as the disputes involve alleged violation by Southland of the Franchise Investment Law they are not subject to arbitration; and that Southland has waived its right to insist upon arbitration in certain of the cases. Franchisees also contend that if there is to be arbitration it should proceed on a classwide, rather than individual, basis. We will hold that the adhesive nature of the franchise contract is not itself a bar to enforcement of the arbitration provision, but that the trial court properly excluded claims based upon alleged violation of the Franchise Investment Law. We will affirm the trial court's holding that there has been no waiver by Southland of its right to insist upon arbitration; but we will remand to the trial court for determination as to whether the interests of justice require that the order to arbitrate be conditioned upon Southland's acceptance of classwide arbitration.

We first describe the factual and procedural background relevant to analysis. Under the terms of Southland's standard 7-Eleven franchise agreement (hereafter the agreement(s)), Southland provides each franchisee with a license to use certain nationally known and federally registered trademarks, a lease or sublease of certain convenience food stores owned or leased by Southland, the financing of store inventories, and advertising and merchandising assistance. The franchisees, in turn, operate the stores, supply Southland with certain bookkeeping data, make bank deposits of receipts from the operation of the stores, and pay Southland a fixed percentage of gross profits. Each of the agreements contains an arbitration clause providing, essentially, that "[a]ny controversy or claim arising out of or relating to this Agreement or the breach thereof shall be settled by arbitration in accordance with the Rules of the American Arbitration Association ... and judgment upon any award rendered by the arbitrator may be entered in any court having jurisdiction thereof."

Between September 1975 and January 1977, franchisees Gouveia, Sampson, Cheng and Newell (and one other franchisee whose claim has since been settled) filed individual actions against Southland alleging, among other things, fraud, oral misrepresentation, breach of contract, breach of fiduciary duty, and violation of the disclosure requirements of the Franchise Investment Law (Corp. Code, § 31000 et seq.). In each of these actions except *Gouveia*, Southland filed an answer in which the

failure to arbitrate was an affirmative defense, but it took no further steps based on that defense at the time, nor did it actively seek arbitration until after the *Keating* action was filed. In *Gouveia, Newell* and *Sampson* it filed cross-complaints, and participated in discovery, including taking the depositions of each of the named plaintiffs.

In May 1977 franchisee Keating filed a class action on behalf of an asserted class composed of approximately 800 Southland franchisees in California, alleging claims substantially similar to those being claimed by the other franchisees, and alleging also that Southland's accounting procedures were unfair and inaccurate. Southland promptly removed *Keating* to the federal district court, and filed an answer and counterclaim to the complaint. A few days later, it filed an amended answer asserting arbitration as a defense. When *Keating* was remanded to the state courts, at franchisees' request, Southland petitioned to compel arbitration in all of the pending cases, but ruling on that petition was stayed pending determination of a motion by the franchisees for coordination of the actions. By this time, the list of actions included a class action filed by franchisee Battersby, and the parties stipulated that *Battersby* would be governed by the rulings in *Keating*.

In November 1977, the motion to coordinate the various actions was granted by the Judicial Council, on condition that franchisees file substantially amended complaints which would demonstrate the asserted similarities among the actions. The amended complaints contain substantially comparable allegations including claims of misrepresentations in connection with the sale of the franchises and inaccurate information about fees, discounts, and the overall performance of 7-Eleven stores.

Except for the claims based on the Franchise Investment Law, the trial court granted Southland's motions to compel arbitration in each of the coordinated actions, without passing upon the franchisees' request for class certification. Southland then appealed from the order to arbitrate insofar as it excluded claims based on the Franchise Investment Law, and the franchisees filed a petition for writ of mandate or prohibition seeking relief from the order to arbitrate on the various grounds stated above. We proceed to consider the issues presented in the order most convenient for discussion. Initially, we observe that since the franchise agreements were between a Texas corporation and California residents, entailed the right to use federally registered trademarks, and contemplated a continuing business relationship between the parties across state lines, they involve interstate commerce and fall within the

ambit of the Federal Arbitration Act. (9 U.S.C. § 2.)[2] We shall, therefore, take that statute into account in passing upon the issues presented.

## I. ADHESION.

In his declaration in opposition to Southland's petition to compel arbitration, Keating stated the franchise agreement was presented to him by Southland representatives on a take-it-or-leave-it basis, with no opportunity to bargain or to negotiate; and that other than the information set forth in the franchise agreement itself, and a pamphlet of the American Arbitration Association describing their procedures, he was "given no verbal or written explanation of the meaning of arbitration, the concept of an arbitration proceeding, the fact that it involved [his] waiver of [his] constitutional rights to a jury trial, a loss of the right to utilize the protection of the courts in the discovery process, nor any information with respect to what arbitration would cost in a procedure of this type." He, and the other franchisees who, in effect, adopt his declaration, contend that the declaration raised questions of fact concerning the enforceability of the arbitration clauses which should have been resolved before arbitration was ordered. The trial court ordered arbitration notwithstanding these contentions. On this score, we find no error.

We accept franchisees' characterization of the franchise agreements, and hence the arbitration agreements, as contracts of adhesion, ". . . 'a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it.'" (*Graham* v. *Scissor-Tail, Inc.* (1981) 28 Cal.3d 807, 817 [171 Cal.Rptr. 604, 623 P.2d 165], quoting from Justice Tobriner's decision in *Neal* v. *State Farm Ins. Cos.* (1961) 188 Cal.App.2d 690, 694 [10 Cal.Rptr. 781].) It is undisputed that the franchise agreements in question here are standardized in form, at least as regards the arbitration provision; and that they are drafted and imposed by defendant, a large corporation of vastly superior bargaining strength, upon all parties desiring a 7-Eleven franchise. The California Legislature has determined that franchisees

---

[2]Section 2 provides: "A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."

are in need of special protection in dealing with franchisors. (Corp. Code, § 31001, see generally Corp. Code, § 31000 et seq.)[3] While the franchisees were financially interested in establishing a beneficial business relationship with Southland, and while that interest may not constitute a "needed service" in the sense envisaged in *Madden v. Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 711 [131 Cal.Rptr. 882, 552 P.2d 1178], or a "service of great importance to the public" as contemplated in *Tunkl v. Regents of University of California* (1963) 60 Cal.2d 92, 99 [32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693], it is now clear that those factors are not prerequisite to a finding of adhesion. (*Graham v. Scissor-Tail, Inc., supra*, 28 Cal.3d at pp. 818, 820, fn. 18.)

■ It does not follow, however, that the contracts are unenforceable. "To describe a contract as adhesive in character is not to indicate its legal effect. It is, rather, 'the beginning and not the end of the analysis insofar as enforceability of its terms is concerned.' [Citation.]" (*Graham v. Scissor-Tail, Inc., supra*, 28 Cal.3d at p. 819.) ■ "Thus, a contract of adhesion is fully enforceable according to its terms [citations] unless certain other factors are present which, under established legal rules—legislative or judicial—operate to render it otherwise." (*Id.*, at pp. 819-820.) "Generally speaking, there are two judicially imposed limitations on the enforcement of adhesion contracts or provisions thereof. The first is that such a contract or provision which does not fall within the reasonable expectations of the weaker or 'adhering' party will not be enforced against him. [Citations.] The second—a principle of equity applicable to all contracts generally—is that a contract or provision, even if consistent with the reasonable expectations of the parties, will be denied enforcement if, considered in its context, it is unduly oppressive or 'unconscionable.'" (*Id.*, at p. 820.)

[3]Corporations Code section 31001 provides, "The Legislature hereby finds and declares that the widespread sale of franchises is a relatively new form of business which has created numerous problems both from an investment and a business point of view .... [¶] It is the intent of this law to provide each prospective franchisee with the information necessary to make an intelligent decision regarding franchises being offered. Further, it is the intent of this law ... to protect the franchisor by providing a better understanding of the relationship between the franchisor and franchisee with regard to their business relationship." (See Damon, *Franchise Investment Law* (1971) 2 Pacific L.J. 27, 27-30, 35-36.) The need for such "special protection" has been recognized in other states and by the federal government who have enacted similar legislation. (15 U.S.C. § 45 (a)(1) (1964); Fla. Stat. Ann., § 817.416 (1971) and Rules Chap. 2-17 (1974); Hawaii Rev. Stat., § 482E-1 (1974); Ill. Rev. Stat., ch. 121-½, § 702 (1974) (Smith-Hurd); Ind. Code, § 23-2-2.5-47 (1975); Mich. Stat. Ann., § 19.854(1) (1974); Minn. Stat., 80C.01 (1973); Ore. Rev. Stat., § 650.007, rule 40-050 (1975); R.I. Gen.

Arbitration in the setting of a contract of adhesion does pose special problems, both because arbitration necessarily entails relinquishment of the constitutional right to trial by jury and because it is susceptible of being structured, or utilized, in such a way as to gain unfair advantage to the party with superior bargaining power. *Graham v. Scissor-Tail, Inc., supra*, 28 Cal.3d 807, in which the agreement called for arbitration by a presumptively partial tribunal, provides an example of that sort of unfairness (see also, *Hope v. Superior Court* (1981) 122 Cal. App.3d 147 [175 Cal.Rptr. 851]). As we shall discuss later in this opinion, reliance upon individual arbitration agreements to insulate the stronger party from otherwise appropriate class actions may also be inequitable depending upon the circumstances.

In the absence of some special element of unfair advantage, however, arbitration is generally considered to be a mutually advantageous process, providing for resolution of disputes in a presumptively less costly, more expeditious, and more private manner by an impartial person or persons typically selected by the parties themselves. (See *Madden v. Kaiser Foundation Hospitals, supra*, 17 Cal.3d 699.) For these reasons, the fact that provision for arbitration is contained in a contract of adhesion will not, of itself, render the provision unenforceable. (*Graham v. Scissor-Tail, Inc., supra*, 28 Cal.3d at pp. 819-820.)

Moreover, provision for arbitration in a commercial context is quite common, and reasonably to be anticipated. Indeed, Keating's declaration itself makes clear that he was aware of the provision, and of the American Aribitration Association pamphlet making reference to the applicable rules. In such a setting neither he nor the other franchisees are in a position to claim that the arbitration provision itself, or the fact that it would entail waiver of jury trial, lack of formal discovery, or certain costs, did not "fall within [their] reasonable expectations." (*Graham v. Scissor-Tail, Inc., supra*, 28 Cal.3d at p. 820.)

For these reasons, we conclude that the arbitration provisions of the franchise agreement were, in general, binding and enforceable. We proceed now to consider the remaining issues.

II. ARBITRABILITY OF FRANCHISE INVESTMENT LAW CLAIMS.

We next consider Southland's appeal from the trial court's denial of its petitions to compel arbitration concerning certain claims made against it pursuant to the Franchise Investment Law (Corp. Code,

Laws, § 19-28-2 (1973); Va. Code, § 13.1-558 (1972); Wash. Rev. Code, § 19.100.010 (1972); and Wis. Stat., § 553.01 (1972) Admin. Code, § 31.01.)

§ 31000 et seq.). These claims assert, among other things, that Southland systematically violated section 31202[4] of the Corporations Code by wilfully making untrue statements of material fact, and by wilfully omitting to state material facts which are required to be stated in statements required to be disclosed under section 31101.[5] The trial court was apparently of the view that these claims were not subject to arbitration as a matter of contract interpretation and also as a consequence of Corporations Code section 31512, part of the Franchise Investment Law, which provides: "Any condition, stipulation or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of this law or any rule or order hereunder is void." Since we agree with the latter conclusion we find it unnecessary to consider the former.

In *Wilko* v. *Swan* (1953) 346 U.S. 427 [98 L.Ed. 168, 74 S.Ct. 182], the United States Supreme Court interpreted nearly identical language in section 14 of the Securities Act of 1933 (15 U.S.C. § 77n)[6] to permit suit by a customer against a securities brokerage firm for alleged misrepresentation in the sale of securities, notwithstanding a provision for arbitration contained in the margin agreement. The arbitration clause, the court decided, constituted a "stipulation," and the right to select the judicial forum the kind of "provision" that could not be waived in advance under section 14. (346 U.S. at pp. 434-435 [98 L.Ed. at p. 175].) In arriving at this conclusion, the court observed that section 12(2) of the act "created a special right to recover for misrepresentation which differs substantially from the common-law action in that the seller is made to assume the burden of proving lack of scienter" (346 U.S. at p. 431 [98 L.Ed. at p. 173]), and that this "special right" was enforceable in any court of competent jurisdiction, with a wide choice of venue (*ibid.*). The court placed primary emphasis, however, upon the proposition that the effectiveness of the statute "is lessened in arbitration as compared to judicial proceedings" (*id.*, at p. 435 [98 L.Ed. at p. 176]), in part bacause of the limited nature of judicial review (*id.*, at p. 436 [98 L.Ed. at p. 176]). "As the protective provisions of the Securities

---

[4]Section 31202 provides: "It is unlawful for any person willfully to make any untrue statement of a material fact in any statement required to be disclosed in writing pursuant to Section 31101, or willfully to omit to state in any such statement any material fact which is required to be stated therein."

[5]Section 31101, subdivision (c) listed some 14 items of information to be disclosed.

[6]That language reads: "Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter or of the rules and regulations of the Commission shall be void."

Act require the exercise of judicial direction to fairly assure their effectiveness, it seems to us that Congress must have intended [the waiver provision] to apply to waiver of judicial trial and review (*id.*, at p. 437 [98 L.Ed. at pp. 176-177]).[7]

The evidence is persuasive that in drafting the Franchise Investment Law California legislators looked to the Securities Act of 1933 as their model. Not only do the two statutes have the same purpose of protecting investors through preinvestment disclosure statements, but their parallel provisions are often expressed in identical language.[8] Corporations Code section 31301 contains substantially the same provision relating to scienter as the United States Supreme Court relied upon in *Wilko.*[9] And, as we have observed, the waiver language of the two statutes is virtually identical.

[7]In *Scherk v. Alberto-Culver Co.* (1974) 417 U.S. 506 [41 L.Ed.2d 270, 94 S.Ct. 2449], the Supreme Court declined to apply the *Wilko* rule to a suit under section 10(b) of the Securities Exchange Act of 1934 and rule 10b-5 thereunder, for rescission of a purchase agreement by which Alberto-Culver Co., an American corporation, purchased the trademarks and stock of two foreign corporations. In reaching this conclusion, the court relied primarily on the international character of the transaction, reasoning that "[a] parochial refusal by the courts of one country to enforce an international arbitration agreement would not only frustrate [policies of certainty and predictability], but would invite unseemly and mutually destructive jockeying by the parties to secure tactical litigation advantages." (*Id.*, at pp. 516-517 [41 L.Ed.2d at p. 279].) While the court made reference to the fact that the Securities Exchange Act did not contain the liberal venue provisions of the Securities Act, and suggested that a "colorable argument" could be made for distinguishing *Wilko* on that ground (*id.*, at p. 513 [41 L.Ed.2d at p. 277]), subsequent cases have continued uniformly to apply the *Wilko v. Swan* rule to actions brought by customers against brokerage houses under the Securities Exchange Act, limiting *Scherk* to the arena of international securities transactions. (*Merrill Lynch, Pierce, Fenner & Smith v. Moore* (10th Cir. 1978) 590 F.2d 823; accord, *Mansbach v. Prescott, Ball & Turben* (6th Cir. 1979) 598 F.2d 1017; *Weissbuch v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (7th Cir. 1977) 558 F.2d 831; *Sibley v. Tandy Corp.* (5th Cir. 1977) 543 F.2d 540; *Ayres v. Merrill Lynch, Pierce, Fenner & Smith* (3d Cir. 1976) 538 F.2d 532.) The Second Circuit has suggested that the relatively equal bargaining status of the parties in *Scherk* was also a distinguishing factor. (*Weissbuch v. Merrill Lynch, Pierce, Fenner & Smith Inc., supra*, 558 F.2d at p. 835; see generally, Gruenbaum, *Avoiding the Protections of the Federal Securities Laws: The Anti-Waiver Provisions* (1980) 20 Santa Clara L.Rev. 49.)

[8]Compare the definition of "sale" under section 2 of the Securities Act (15 U.S.C. § 77(b)(3)) with that in Corporations Code section 31018; the definition of "misrepresentations by omission" in section 12(2) of the Securities Act (15 U.S.C. § 77*l*(2)) with Corporations Code section 31201; the burden of proving due diligence of section 11 of the Securities Act (15 U.S.C. § 77k(b)(3)) with Corporations Code section 31301; the provision for injunction actions in section 20 of the Securities Act (15 U.S.C. § 77t(a)) with Corporations Code section 31400; and the liability of control persons of section 15 of the Securities Act (15 U.S.C. § 77o) with Corporations Code section 31302.

[9]Section 31301 provides: "Any person who violates Section 31201 shall be liable to any person (not knowing or having cause to believe that such statement was false or

■ "This court has long recognized the principle of statutory construction that '[w]hen legislation has been judicially construed and a subsequent statute on the same or an analogous subject is framed in the identical language, it will ordinarily be presumed that the Legislature intended that the language as used in the later enactment would be given a like interpretation. This rule is applicable to state statutes which are patterned after the federal statutes. [Citations.]'" (*Belridge Farms* v. *Agricultural Labor Relations Bd.* (1978) 21 Cal.3d 551, 557 [147 Cal.Rptr. 165, 580 P.2d 665].)

■ The presumption established by that principle of statutory construction is reinforced by the language and history of the recently adopted California Franchise Relations Act (Bus. & Prof. Code, § 20000 et seq.), regulating the grounds and procedure for termination and nonrenewal of franchises. That statute stemmed from hearings conducted in late 1977 by a subcommittee of the state Assembly Committee on Finance, Insurance, and Commerce, chaired by Assemblyman Bruce Young. A preliminary report prepared by that committee prior to hearings refers to the Franchise Investment Law as a "prepurchase disclosure law patterned after the Securities Act of 1933," discusses various proposals for extending regulation of franchise relationships, and poses various rhetorical questions in that regard, among them the following: "Present law provides for the resolution of franchisee/franchisor disputes through the judicial system. Should the law be modified to provide for other means of resolution such as compulsory arbitration and/or a Board of Franchising?"[10] The Franchise Relations Act as ultimately adopted by the Legislature contains both a nonwaiver provision nearly identical to Corporations Code section 31512 and the following provision authorizing limited arbitrability of disputes under that statute: "Nothing contained in this chapter shall limit the right of a franchisor and franchisee to agree before or after a dispute has arisen to binding arbitration of claims under this chapter, provided that: (a) The standards applied in such arbitration are not less than the requirements specified in this chapter; and (b) The arbitrator or arbitrators employed in such arbitration are chosen from a list of im-

misleading) who, while relying upon such statement shall have purchased a franchise, for damages, unless the defendant proves that the plaintiff knew the facts concerning the untruth or omission or that the defendant exercised reasonable care and did not know, (or if he had exercised reasonable care would not have known) of the untruth or omission."

[10]Assembly Committee on Finance, Insurance, and Commerce, Ad Hoc Subcommittee on Franchising, An Evaluation of the Regulation of Franchising in California and Prospective Legislative Revisions—Background Notes for Interim Study, page 6.

partial arbitrators supplied by the American Arbitration Association or other impartial person." (Bus. & Prof. Code, § 20040.) The inference is strong, if not inescapable, that the Legislature understood the antiwaiver provision of the Franchise Investment Law to be subject to the *Wilko* (346 U.S. 427) interpretation, and that it intended to establish a different rule for the Franchise Relations Act.[11] While we have no evidence as to the policy reasons underlying that distinction, it may be that the Legislature considered arbitration more acceptable in the context of franchise relationships already established, presumably on the basis of proper disclosure, or that it considered the more detailed provisions in the Franchise Investment Law for civil liability (Corp. Code, § 31300), administrative regulation (Corp. Code, § 31400) and criminal liability (Corp. Code, § 31410 et seq.), to require access to the courts and "the exercise of judicial direction to fairly assure their effectiveness." (*Wilko v. Swan, supra*, 346 U.S. at p. 437 [98 L.Ed. at p. 176].)

Having determined that the California Legislature intended the nonwaiver provision of the California Franchise Act to be interpreted in accord with *Wilko v. Swan*,[12] we turn to Southland's contention that the statute as so construed may not constitutionally be applied to a "contract evidencing a transaction involving commerce" within the meaning of the Federal Arbitration Act (FAA). The argument is that the FAA, in mandating that a provision for arbitration in such a contract "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract" (FAA, § 2), establishes a general principle of arbitrability which preempts any state law or policy restrictive of arbitration, whatever the basis for that law or policy might be, and whether or not federal jurisdiction over the underlying controversy exists. We consider that argument overly broad.

[11]This inference is supported by the following legislative history. Assemblyman Young, who was the author of the bill which became the Franchise Relations Act, sponsored an earlier bill (Assem. Bill No. 944 (1977 Reg. Sess.)) which provided for similar restrictions upon termination of franchises through addition of a new chapter (§ 31220 et seq.) to the Corporations Code. That bill contained a section providing for a similar nonwaiver provision which read as follows: "31224: (a) *Except as provided in subdivision (b) of this section*, any condition, stipulation, provision, or term of any· franchise agreement waiving any rights granted under the chapter or relieving any person from liability imposed by this chapter shall be void and unenforceable." (Italics added.) Subdivision (b) permitted agreements for "binding arbitration of disputes" subject to the restrictions presently contained in the new law.

[12]As in *Wilko*, the agreement here was to arbitrate such disputes as might arise in the future. We express no view as to the enforceability of an agreement to arbitrate a pending dispute under the Franchise Investment Law.

The starting point for analysis is *Prima Paint* v. *Flood & Conklin* (1967) 388 U.S. 395 [18 L.Ed.2d 1270, 87 S.Ct. 1801], in which the Supreme Court held that in a federal court diversity action involving a contract subject to the FAA, a claim of fraud in the inducement of the contract (as distinguished from a claim of fraud in the inducement of the arbitration clause), is a question for the arbitrator, and not the court, to decide; and that this rule applies even though the law of the state in which the contract was to be performed might have a different rule.

The Supreme Court in *Prima Paint* rejected the contention that it was "constitutionally impermissible" to apply the FAA because the case was in the federal court solely by reason of diversity of citizenship. "[T]he question," the court said, "is not whether Congress may fashion federal substantive rules to govern questions arising in simple diversity cases . . . [but] whether Congress may prescribe how *federal* courts are to conduct themselves with respect to subject matter over which Congress plainly has power to legislate." (*Id.*, at p. 405 [18 L.Ed.2d 1278]; italics added.) The opinion thus left open the question whether or under what circumstances *state* courts are constitutionally obligated to apply the substantive principles inherent in the federal statute.

Shortly after *Prima Paint* was decided, the New York Court of Appeal indicated it would apply FAA principles to a maritime transaction "even if such a result is not constitutionally mandated by the decision in *Prima Paint*," in order to discourage forum shopping between state and federal courts. (*A/S J. Ludwig Mowinckels R.* v. *Dow Chem. Co.* (1970) 25 N.Y.2d 576 [307 N.Y.S.2d 660, 666, 255 N.E.2d 774].) Since then a number of courts, both federal and state, have adopted the view that while the FAA is not itself a source of federal jurisdiction, the statute contains certain principles of "substantive federal law" which must be applied, regardless of forum, where federal jurisdiction exists. (E.g., *In re Mercury Const. Corp.* (4th Cir. 1981) 656 F.2d 933, 938; *E. C. Ernst, Inc.* v. *Manhattan Const. Co. of Texas* (5th Cir. 1977) 551 F.2d 1026, 1040; *Pathman Const. Co.* v. *Knox County Hospital Ass'n* (1975) 164 Ind.App. 121 [326 N.E.2d 844, 851]; *Episcopal Housing Corp.* v. *Federal Ins. Co.* (1977) 269 S.C. 631 [239 S.E.2d 647]; *Main* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1977) 67 Cal.App.3d 19, 24-25 [136 Cal.Rptr. 378].)

While the federal district court in this case, by its remand, determined that federal jurisdiction over the franchisees' lawsuit did *not*

exist, the likely explanation for that determination is the presence in the case of defendants whose citizenship precludes requisite diversity. Accordingly, we do not decide the preemption issue on that narrow ground (see *In re Mercury Const. Corp., supra*, 656 F.2d at p. 942).

Rather, we confront squarely the underlying issue of statutory interpretation: whether the principles of *"substantive federal law"* embodied in the FAA, preclude a state from protecting its franchise investors through a system of statutory regulation including nonwaivable judicial remedies. While there is authority for an affirmative answer (*Allison v. Medicab Intern., Inc.* (1979) 92 Wn.2d 199 [597 P.2d 380, 383]; *Barron v. Tastee Freez Intern., Inc.* (E.D. Wis. 1980) 482 F. Supp. 1213), we respectfully disagree.

The FAA was adopted in 1925 (43 Stat. 883), against a background of judicial hostility to arbitration generally. (See *Kulukundis Shipping Co. v. Amtorg Trading Corp.* (2d Cir. 1942) 126 F.2d 978, 984; Sayre, *Development of Commercial Arbitration Law* (1927) 37 Yale L.J. 595.) The apparent purpose of the statute was to remove that hostility, and so "make the benefits of arbitration generally available to the business world." (*Robert Lawrence Company v. Devonshire Fabrics, Inc.* (2d Cir. 1959) 271 F.2d 402, 407.) While there is nothing in the legislative history of the statute to suggest that Congress considered its application to state courts (see, Sturges & Murphy, *Some Confusing Matters Relating to Arbitration Under the United States Arbitration Act* (1952) 17 Law & Contemp. Prob. 580, *passim*), we assume that Congress intended to insulate interstate contracts from judicial hostility regardless of forum (see *Fite & Warmath Const. Co., Inc. v. MYS Corp.* (Ky. 1977) 559 S.W.2d 729), and to establish for such contracts certain uniform rules of interpretation (see *Guinness-Harp Corp. v. Jos. Schlitz Brewing* (2d Cir. 1980) 613 F.2d 468, 472.)

In these respects, California law is entirely in accord. Two years after the FAA was enacted, this state adopted its first modern arbitration statute (Stats. 1927, ch. 225), declaring arbitration agreements to be irrevocable and enforceable in terms identical to those used in section 2 of the federal act, and since that time California courts and its Legislature have "consistently reflected a friendly policy toward the arbitration process." (Kagel, A Study Relating to Arbitration, in Cal. Law. Revision Com. Recommendations and Study Relating to Arbitration (1960) p. G-28.) That policy was expanded and clarified in the current arbitration statute which was adopted in 1961 (Stats. 1961, ch. 461, § 2 et

seq.), and it continues to be the policy of this state (e.g., *Doers* v. *Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 189 [151 Cal.Rptr. 837, 588 P.2d 1261]).

Adoption of an affirmative policy toward enforcement of arbitration agreements has never implied, however, that all types of disputes are subject to arbitration. In New York, for example, one of the earliest states to encourage arbitration through statute, certain categories of disputes are insulated from arbitration as a matter of public policy. (See *Associated Teachers, etc.* v. *Bd. of Ed.* (1979) 33 N.Y.2d 229 [351 N.Y.S.2d 670, 306 N.E.2d 791].) Among these are disputes under state antitrust laws, on the ground that "through the use of economic power and contracts of adhesion, containing broad arbitration clauses, antitrust violators may be able to insulate their transgressions of the antitrust law from judicial scrutiny." (*Aimcee Wholesale Corp.* v. *Tomar Products* (1968) 21 N.Y.2d 621, 629 [289 N.Y.S.2d 968, 973-974, 237 N.E.2d 233].) The same is true of matters involving the liquidation of insolvent insurance companies (*Knickerbocker Agency* v. *Holz* (1958) 4 N.Y.2d 245 [173 N.Y.S.2d 602, 607-610, 149 N.E.2d 885]), or the usurious character of a purported sales agreement (*Durst* v. *Abrash* (1964) 22 App.Div.2d 39 [253 N.Y.S.2d 351, 353]).

Such exceptions to the general principle of arbitrability, like those expressed in California's Franchise Investment Law, do not reflect hostility toward arbitration, nor do they constitute an obstacle to the general enforcement of arbitration agreements in a manner consistent with federal law. Rather, such exceptions are narrowly confined to rights and remedies created by state regulatory statutes, and represent a determination that the public interest is best served by maintaining access to the remedies which the Legislature has provided. That Congress intended, through the FAA, to override state policies of that nature seems highly improbable.

The question in this case might be more debatable were it not for the fact that California's policy of protecting judicial remedies for this state's franchise investors was patterned after, and is consistent with, federal policy in the analogous area of securities investment.[13] There is no suggestion that Congress has preempted the field of franchise investor regulation as it has, for example, the field of labor relations (cf.

---

[13]We observe that California's Corporate Securities Law contains a substantially identical nonwaiver provision (Corp. Code, § 25701.) Southland's argument would preclude its application to interstate transactions as well.

*Teamsters Union* v. *Oliver* (1959) 358 U.S. 283 [3 L.Ed.2d 312, 79 S.Ct. 297]), or that the FAA embodies substantive principles intrinsic to a federally regulated field (cf. *Textile Workers* v. *Lincoln Mills* (1957) 353 U.S. 448 [1 L.Ed.2d 972, 77 S.Ct. 912]). Having left states with power to enact laws in this area, it is hardly likely that Congress intended to preclude them from adopting policies which Congress itself has found to be appropriate.[14]

Preemption principles were recently summarized by the United States Supreme Court in *Merrill Lynch, Pierce, Fenner & Smith* v. *Ware* (1973) 414 U.S. 117 [38 L.Ed.2d 348, 94 S.Ct. 383], holding that California's statutory policy excluding wage claims from arbitration (Lab. Code, § 229) was not preempted by rules promulgated by the New York Stock Exchange pursuant to federal law: "'The principle to be derived from our decisions is that federal regulation of a field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained.' [Citation.] [¶] In other contexts, preemption has been measured by whether the state statute frustrates any part of the purpose of the federal legislation. [Citations.] And ... while prior cases on pre-emption 'are not precise guidelines,' because each case turns on the peculiarities and special features of the federal regulatory scheme in question, it is where there is in existence a pervasive and comprehensive scheme of federal regulation that pre-emption follows in order to fulfill the federal statutory purposes. [Citations.] [¶] In the area of regulation that we are considering here, California has manifested a strong policy of protecting its wage earners from what it regards as undesirable economic pressures affecting the employment relationship. This policy prevails in the absence of interference with the federal regulatory scheme. We find no such interference ...." (414 U.S. at pp. 139-140 [38 L.Ed.2d at p. 366].)

The court in *Ware* did not consider the applicability of the FAA, and the holding in the case is consequently not controlling here, but the principles which the court announced strongly support rejection of

---

[14]Southland observes that two federal statutes which regulate franchise relationships (Petroleum Marketing Practices Act (15 U.S.C. § 2801 et seq.) and Automobile Dealer Suits Against Manufacturers (15 U.S.C. § 1221 et seq.) do not contain provisions similar to 15 United States Code section 77n. Neither of these statutes impose analogous disclosure requirements however, nor has the issue of arbitrability of disputes under them been litigated in reported cases.

Southland's argument. Not only has California "manifested a strong policy of protecting its [franchise investors] from what it regards as undesirable economic pressures affecting the [franchise] relationship" (*ibid.*), it has done so through a regulatory scheme containing remedies which it has deemed appropriate to protect against waiver, and in accordance with policies compatible with the pattern of federal regulation.

The United States Supreme Court has "repeatedly warned against the dangers of an approach to statutory construction which confines itself to the bare words of a statute, [citations], for 'literalness may strangle meaning.' [Citation]." (*Lynch* v. *Overholser* (1962) 369 U.S. 705, 710 [8 L.Ed.2d 211, 215, 82 S.Ct. 1063].) We accept that the FAA contains certain principles of substantive federal law which must be applied, regardless of forum, where federal jurisdiction exists; on that point we are fully in accord with our dissenting colleagues. We simply reject Southland's argument that those principles are so unyielding as to require enforcement of an agreement to arbitrate a dispute over the application of a regulatory statute which a state legislature, in conformity with analogous federal policy, has decided should be left to judicial enforcement.[15]

## III. WAIVER.

■ Franchisees contend that Southland waived its right to arbitration by delays in asserting it, and by pursuing legal actions which were inconsistent with it. We will separately consider waiver in connection with *Keating*, and with the individual actions.

The law in this area is rather well defined. ■ Arbitration is strongly favored. Courts will closely scrutinize any claims of waiver (*Gavlik Const. Co.* v. *H. F. Campbell Co.* (3d Cir. 1975) 526 F.2d 777, 783; *Seidman & Seidman* v. *Wolfson* (1975) 50 Cal.App.3d 826, 835 [123 Cal.Rptr. 873]; 9 U.S.C. § 3; Code Civ. Proc., § 1281.2, subd. (a)), and "'indulge every intendment to give effect to such proceedings.' (*Pacific Inv. Co.* v. *Townsend* (1976) 58 Cal.App.3d 1, 9 [129 Cal.Rptr.

---

[15]Southland urges that exclusion of Franchise Investment Law claims from arbitration will lead to duplicative proceedings because franchisees' common law claims of fraud and negligent misrepresentation involve the "same constellation of facts." Under federal law, such considerations may be taken into account in determining the order of proceedings, and even in determining whether common law claims should be decided in a judicial forum. (*Sibley* v. *Tandy Corp., supra*, 543 F.2d 540, 543, cert. den. (1977) 434 U.S. 824 [54 L.Ed.2d 82, 98 S.Ct. 71]; *Miley* v. *Oppenheimer & Co., Inc.* (5th Cir. 1981) 637 F.2d 318.)

489].)" (*Doers* v. *Golden Gate Bridge etc. Dist., supra*, 23 Cal.3d 180, 189.) Moreover, the burden of proof is "heavy" and rests on the party seeking to establish waiver (*Martin Marietta Aluminum, Inc.* v. *General Elec. Co.* (9th Cir. 1978) 586 F.2d 143, 146; *General Guar. Ins. Co.* v. *New Orleans General Agency, Inc.* (5th Cir. 1970) 427 F.2d 924, 929, fn. 5) which "is not to be lightly inferred." (*Gavlik Const. Co.* v. *H. F. Campbell Co., supra*, 526 F.2d at p. 783; *Davis* v. *Blue Cross of Northern California* (1979) 25 Cal.3d 418, 426 [158 Cal.Rptr. 828, 600 P.2d 1060].)

The trial court here found no waiver. Because the question of waiver is one of fact, we have noted that the "determination of this question, if supported by substantial evidence, is binding on an appellate court. [Citation.] ... [It is only] in cases where the record before the trial court establishes a lack of waiver as a matter of law, [that] the appellate court may reverse a finding of waiver made by the trial court." (*Doers* v. *Golden Gate Bridge etc. Dist., supra*, 23 Cal.3d at p. 185; see *Reid Burton Const.* v. *Carpenters Dist. Council, etc.* (10th Cir. 1980) 614 F.2d 698, 703, cert. den. (1980) 449 U.S. 824 [66 L.Ed.2d 27, 101 S.Ct. 85] [adopting a "clearly erroneous" standard of review].)

■ We have recently acknowledged that while there is no "single test" in establishing waiver, the relevant factors include whether the party seeking arbitration (1) has "previously taken steps inconsistent with an intent to invoke arbitration," (2) "has unreasonably delayed" in seeking arbitration, (3) or has acted in "bad faith" or with "wilful misconduct." (*Davis* v. *Blue Cross of Northern California, supra*, 25 Cal.3d at pp. 425-426; see *Germany* v. *River Terminal Railway Company* (6th Cir. 1973) 477 F.2d 546, 547.) We have stressed the significance of the presence or absence of prejudice. Waiver does not occur by mere participation in litigation; there must be "judicial *litigation* of the merits of arbitrable issues" (*Doers* v. *Golden Gate Bridge etc. Dist., supra*, 23 Cal.3d at p. 188), although "waiver could occur prior to a judgment on the merits if prejudice could be demonstrated" (*id.*, at p. 188, fn. 3). This result is fully consistent with federal cases which have held that "as an abstract exercise in logic it may appear that it is inconsistent for a party to participate in a lawsuit for breach of a contract, and later to ask the court to stay that litigation pending arbitration. Yet the law is clear that such participation, standing alone, does not constitute a waiver [citations], for there is an overriding federal policy favoring arbitration. ... [M]ere delay in seeking a stay of the proceedings without some resultant prejudice to a party [citation], can-

not carry the day." (*Carcich* v. *Rederi A/B Nordie* (2d Cir. 1968) 389 F.2d 692, 696; see *Shinto Shipping Co.* v. *Fibrex & Shipping Co., Inc.* (9th Cir. 1978) 572 F.2d 1328, 1330.)

■ Tested by these principles, the record fully supports the trial court's conclusion that there was no waiver in *Keating*. Southland had a legal right to petition for removal of the case to the federal district court; it did so promptly, as the statute requires (28 U.S.C. § 1446(b)); and in its amended pleading it asserted the arbitration agreement as a defense. Prior to remand, the only discovery which took place consisted of an exchange of documents to franchisees' benefit. Upon remand, Southland moved promptly to compel arbitration.[16] We discern no impropriety on the part of Southland, or prejudice to franchisees, in these brief transactions.

■ In the remaining four individual actions, namely, *Gouveia, Sampson, Cheng*, and *Newell*, the trial court granted the motions to arbitrate except as to the Franchise Investment Law claims, and stayed the proceedings pending completion of arbitration. In noting the coordination of the various actions the court observed that "there are matters which would otherwise be arbitrable which are raised for the first time in the second amended complaint." It believed that referring to arbitration only some issues while retaining others might well achieve inconsistent results and would serve no useful purpose. The court also observed that in some cases, separately viewed, "there more than likely would have been found to be a waiver."

Franchisees interpret the foregoing trial court remarks as constituting a holding of waiver. They also contend that the trial court erred in misconstruing the coordination of the proceedings as requiring complete consistency of result between the individual cases. We do not agree. Extensively amended complaints have been filed in each case after the actions had been coordinated at franchisees' request. We cannot say, as a matter of law, that the court erroneously considered the coordinated posture of the cases in finding a lack of waiver of Southland's right to arbitration. Franchisees themselves asserted in their motion for coordination that "[e]ach of the actions for which coordination is sought herein is at the same relative stage of development." Furthermore, the court did not specify in which of the actions a waiver might have appeared, and franchisees' argument that the trial court found a waiver in any individual case is purely speculative.

---

[16]It moved also for a change of venue, which was granted by stipulation.

Moreover, assuming a waiver had occurred as to the charging allegations in the original complaints, such waiver would not extend to issues newly raised. (Cf. *Janmort Leas., Inc.* v. *Econo-Car Intern.* (E.D.N.Y. 1979) 475 F.Supp. 1282, 1290.) In seeking coordination and amendment of their complaints, franchisees considerably expanded the scope of their pleadings, raising several new causes of action, injecting new factual elements, and refocusing the direction of their claims. We do not suggest that an amendment to a complaint will, per se, nullify a previous, effective waiver of arbitration in every case. Here, however, franchisees directed a newly concerted attack, evidenced by the filing of amended complaints and the motion to coordinate. This sufficiently changed the proceedings, when viewed in their entirety, to permit the trial court to find a lack of waiver of the right to arbitrate the closely interrelated and interdependent claims.

We are unable to accept franchisees' argument that any waiver occurred because of Southland's litigation-related activities in *Gouveia, Sampson, Cheng*, and *Newell*. As with similar arguments advanced with reference to the *Keating* complaint, Southland's delay in seeking arbitration of the other complaints, its filing of counterclaims and actions for unlawful detainer, and its participation in discovery did not require a finding of waiver. (*Doers* v. *Golden Gate Bridge etc. Dist., supra*, 23 Cal.3d at p. 188; *Carcich* v. *Rederi A/B Nordie, supra*, 389 F.2d at p. 696.) Here, Southland raised arbitration as an affirmative defense in its answers to each of the original complaints except in *Gouveia*. As previously noted, "it is the judicial *litigation* of the merits of arbitrable issues which waives a party's right to arbitration" (*Doers* v. *Golden Gate Bridge etc. Dist., supra*, 23 Cal.3d at p. 188), and the burden is on franchisees to show that the trial court's determination was not supported by the facts. (See, e.g., *Hart* v. *Orion Insurance Company* (10th Cir. 1971) 453 F.2d 1358, 1361.)

Because of the mandatory nature of Code of Civil Procedure section 426.30 requiring that any related cause of action be alleged, no waiver arose by reason of the filing of the cross-complaints. As to the unlawful detainer causes of action, the agreements themselves specifically provide that a demand for arbitration "shall not operate to stay . . . the right of 7-Eleven to take possession of the Lease Property in accordance with the Agreement." The contract contemplated that arbitration and litigation of the right to possession would proceed simultaneously.

Again, we find most significance in the lack of any prejudice demonstrated by franchisees in *Gouveia, Sampson, Cheng,* and *Newell.* While Southland participated in discovery in the individual actions before demanding arbitration, the trial court expressly conditioned its order to compel arbitration on Southland's agreement either to abstain from the use of further discovery or to extend equally extensive discovery to franchisees. Moreover, the discovery was reciprocal; for example, franchisees' petition for coordination indicated that evidence of Southland's bookkeeping practices had already been obtained and was relevant to all of the individual actions.

Neither side had completed its discovery, and Southland asserted, without refutation, that the filing of the new complaints significantly raised new issues requiring further discovery should the cases go to trial. The condition imposed by the trial court on its order for arbitration, however, prevented Southland from taking advantage of any previously discovered information.

Our function is to determine whether the trial court's finding of no waiver is supported by substantial evidence. Franchisees have not made specific claims of prejudice. Nor have we been supplied with any record of the discovery proceedings already undertaken by which we could independently assess such claims if made.

Accordingly, we cannot conclude that the trial court erred in finding no waiver and in ordering arbitration.

IV. CLASS ARBITRATION.

The trial court, in ordering arbitration, did not expressly rule upon the motions in *Keating* and *Battersby* for class certification. Franchisees contend that if arbitration is to proceed the trial court should be instructed to determine the preliminary issues regarding class certification so that it may proceed on a classwide basis. This contention requires us to examine the special problems of unfair advantage which may appear in an adhesion setting when individual arbitration agreements are invoked to block an otherwise appropriate class action.[17]

---

[17]We assume, for purposes of this analysis, that *Keating* and *Battersby* would be maintainable as class actions under established principles, but we intimate no opinion as to whether that is, in fact, the case. That will be an issue for the trial court upon remand.

This court has repeatedly emphasized the importance of the class action device for vindicating rights asserted by large groups of persons. We have observed that the class suit "'both eliminates the possibility of repetitious litigation and provides small claimants with a method of obtaining redress for claims which would otherwise be too small to warrant individual litigation. [Citation.]'" (*Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462, 469 [174 Cal.Rptr. 515, 629 P.2d 23].) Denial of a class action in cases where it is appropriate may have the effect of allowing an unscrupulous wrongdoer to "retain[] the benefits of its wrongful conduct." (*Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 808 [94 Cal.Rptr. 796, 484 P.2d 964, 53 A.L.R.3d 513].)[18] And, as we noted in *La Sala v. American Sav. & Loan Assn.* (1971) 5 Cal.3d 864, 877 [97 Cal.Rptr. 849, 489 P.2d 1113]: "Controversies involving widely used contracts of adhesion present ideal cases for class adjudication; the contracts are uniform, the same principles of interpretation apply to each contract, and all members of the class will share a common interest in the interpretation of an agreement to which each is a party."

If the right to a classwide proceeding could be automatically eliminated in relationships governed by adhesion contracts through the inclusion of a provision for arbitration, the potential for undercutting these class action principles, and for chilling the effective protection of interests common to a group, would be substantial. Arbitration proceedings may well provide certain offsetting advantages through savings of time and expense; but, depending upon the nature of the issues and the evidence to be presented, it is at least doubtful that such advantages could compensate for the unfairness inherent in forcing hundreds or perhaps thousands, of individuals asserting claims involving common issues of fact and law to litigate them in separate proceedings against a party with vastly superior resources. Because the principles of res judicata and collateral estoppel do not apply in arbitration proceedings, any issue resolved against a party such as Southland in one arbitration proceeding would have to be decided anew in a subsequent arbitration, resulting in needless duplication and the potential for inconsistent awards. And while arbitration ideally takes place outside the judicial arena, it would be naive to assume, in such a situation, that courts

---

[18]Federal law is in accord. (See, e.g., *Weeks v. Bareco Oil Co.* (7th Cir. 1941) 125 F.2d 84, 90 ("To permit the defendants to contest liability with each claimant in a single, separate suit, would, in many cases give defendants an advantage which would be almost equivalent to closing the door of justice to all small claimants"); *Moscarelli v. Stamm* (E.D.N.Y. 1968) 288 F.Supp. 453, 461.)

would not be called upon to determine issues ancillary to the arbitration proceedings. The effect would be to place upon the parties, and upon the courts, many of the burdens which the class action device was designed to avoid.

It is common knowledge that arbitration clauses frequently appear in standardized contracts of adhesion. A primary consideration which has led courts to uphold such clauses, despite the adhesive nature of the contract, is the belief that arbitration is not oppressive and does not defeat the reasonable expectations of the parties. (*Madden v. Kaiser Foundation Hospitals, supra*, 17 Cal.3d 699, 710, 712.) If, however, an arbitration clause may be used to insulate the drafter of an adhesive contract from any form of class proceeding, effectively foreclosing many individual claims, it may well be oppressive and may defeat the expectations of the nondrafting party.

One possible solution to this dilemma would be to hold that arbitration agreements contained in contracts of adhesion may not operate to stay properly maintainable class actions. (See *Harris v. Shearson Hayden Stone, Inc.* (1981) 82 App.Div.2d 87 [441 N.Y.S.2d 70, 76-79] (dis. opns.); cf. *Frame v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1971) 20 Cal.App.3d 668, 672 [97 Cal.Rptr. 811]; *Vernon v. Drexel Burnham & Co.* (1975) 52 Cal.App.3d 706 [125 Cal.Rptr. 147].) The statutes and public policy supportive of arbitration require, however, that this result be avoided if means are available to give expression to the basic arbitration commitment of the parties. (*Graham v. Scissor-Tail, Inc., supra*, 28 Cal.3d 807, 831.) We turn our attention, therefore, to the solution offered by franchisees: that the arbitration itself proceed on a classwide basis.

There is, as the parties acknowledge, an absence of direct authority either supporting or rejecting such a procedure. Analogous authority exists, however, with respect to the consolidation of arbitration proceedings involving a dispute which concerns several parties each of whom has an agreement with one or more of the others to arbitrate the dispute. "Although the [Federal Arbitration] Act does not specifically provide for consolidated arbitrations, courts have frequently ordered consolidated arbitration proceedings when the 'interests of justice' so require, either because the issues in dispute are substantially the same and/or because a substantial right might be prejudiced if separate arbitration proceedings are conducted." (*Matter of Czarnikow-Rionda Co.,*

*Inc.* (S.D.N.Y. 1981) 512 F.Supp. 1308, 1309.) Indeed, the Second Circuit has opined that "the liberal purposes of the Federal Arbitration Act clearly require that this act be interpreted so as to permit and even encourage the consolidation of arbitration proceedings in proper cases." (*Compania Espanola de Pet., S.A.* v. *Nereus Ship.* (2d Cir. 1975) 527 F.2d 966, 975, cert. den. (1976) 426 U.S. 936 [49 L.Ed.2d 387, 96 S.Ct. 2450]; see also, *Marine Trading Ltd.* v. *Ore Intern. Corp.* (S.D.N.Y. 1977) 432 F.Supp. 683; *Robinson* v. *Warner* (D.C.R.I. 1974) 370 F.Supp. 828.)

Federal courts, in ordering consolidation of arbitration proceedings in these cases, have relied upon rule 81(a)(3) of the Federal Rules of Civil Procedure, which states that the federal rules apply to certain statutes, including the FAA, "only to the extent that matters of procedure are not provided for in those statutes." Thus, rule 42(a), which provides for consolidation of related proceedings, is deemed to apply. Analogous reasoning would support reliance on rule 23, the class action rule, as a basis for ordering classwide arbitrations when the interests of justice so require.

A number of state courts also support consolidation of arbitration proceedings, even in the absence of express statutory authority. New York courts take the position that "jurisdiction to enforce contracts to arbitrate imports power to regulate the method of enforcement." (*Chariot Textiles Corp.* v. *Wannalancit Textile Co.* (1964) 21 App. Div.2d 762 [250 N.Y.S.2d 493, 495] (dis. opn.), revd. on dis. opn. (1966) 18 N.Y.2d 793 [275 N.Y.S.2d 382, 221 N.E.2d 913]; see also *In re Vigo Steamship Corporation* (1970) 26 N.Y.2d 157 [309 N.Y.S. 2d 165, 257 N.E.2d 624], cert. den. *sub nom.*, *Frederick Snare Corp.* v. *Vigo Steamship Corp.* (1970) 400 U.S. 819 [27 L.Ed.2d 46, 91 S.Ct. 36]; accord: *Grover-Dimond Assoc.* v. *American Arbitration Ass'n* (1973) 297 Minn. 324 [211 N.W.2d 787, 64 A.L.R.3d 522]; see also, *Exber, Inc.* v. *Sletten Construction Company* (1976) 92 Nev. 721 [558 P.2d 517]; *James Stewart Polshek, etc.* v. *Bergen Iron Wks.* (1976) 142 N.J. Super. Ct. 516 [362 A.2d 63]; *Episcopal Housing Corp.* v. *Federal Ins. Co.* (1979) 273 S.C. 181 [255 S.E.2d 451]; *contra: Stop & Shop Companies, Inc.* v. *Gilbane Building Co.* (1973) 364 Mass. 325 [304 N.E.2d 429]; *J. Brodie & Son, Inc.* v. *George A. Fuller Company* (1969) 16 Mich.App. 137 [167 N.W.2d 886]; see generally, Annot., Consolidation of Arbitration Proceedings, 64 A.L.R.3d 528, 529.) In

California, consolidation in certain cases is expressly authorized by statute. (Code Civ. Proc., § 1281.3.)[19]

Consolidated arbitration often involves a tripartite relationship in which the parties in dispute each have a contract with a third party, but not with each other. Each contract may provide a different procedure for arbitration, or a different method of selecting the arbitrator. Federal courts have held that a court "can mold the method of selection and the number of arbitrators to implement the consolidated proceedings." (*Matter of Czarnikow-Rionda Co., Inc., supra*, 512 F.Supp. at p. 1309.) Similarly, Code of Civil Procedure section 1281.3 provides that consolidated arbitration proceedings may be ordered inter alia, where "one party is a party to a separate arbitration agreement or proceeding with a third party," and that if the agreements do not mesh in their description of procedure, a court has authority to appoint an arbitrator, and to "resolve [conflicts among the agreements] and determine the rights and duties of the various parties to achieve substantial justice under all the circumstances." Thus, a party may be forced into a coordinated arbitration proceeding in a dispute with a party with whom he has no agreement, before an arbitrator he had no voice in selecting and by a procedure he did not agree to.

In these respects, an order for classwide arbitration in an adhesion context would call for considerably less intrusion upon the contractual aspects of the relationship. The members of a class subject to classwide arbitration would all be parties to an agreement with the party against whom their claim is asserted; each of those agreements would contain substantially the same arbitration provision; and if any of the members of the class were dissatisfied with the class representative, or with the choice of arbitrator, or for any other reason would prefer to arbitrate on their own, they would be free to opt out and do so. Moreover, the interests of justice that would be served by ordering classwide arbitration are likely to be even more substantial in some cases than the interests that

---

[19]Section 1281.3 was added in 1978 (Stats. 1978, ch. 260, § 2), apparently in response to a Court of Appeal decision holding that courts of this state lacked authority to order consolidation of arbitration proceedings. (*Atlas Plastering, Inc.* v. *Superior Court* (1977) 72 Cal.App.3d 63 [140 Cal.Rptr. 59].) The section permits consolidation of separate arbitration proceedings when "(1) Separate arbitration agreements or proceedings exist between the same parties; or one party is a party to a separate arbitration agreement or proceeding with a third party; and (2) The disputes arise from the same transactions or series of related transactions; and (3) There is common issue or issues of law or fact creating the possibility of conflicting rulings by more than one arbitrator or panel of arbitrators."

are thought to justify consolidation. It is unlikely that the state Legislature in adopting the amendment to the Arbitration Act authorizing consolidation of arbitration proceedings, intended to preclude a court from ordering classwide arbitration in an appropriate case. We conclude that a court is not without authority to do so.

Without doubt a judicially ordered classwide arbitration would entail a greater degree of judicial involvement than is normally associated with arbitration, ideally "'a complete proceeding, without resort to court facilities.'" (*East San Bernardino County Water Dist. v. City of San Bernardino* (1973) 33 Cal.App.3d 942, 950 [109 Cal.Rptr. 510].) The court would have to make initial determinations regarding certification and notice to the class, and if classwide arbitration proceeds it may be called upon to exercise a measure of external supervision in order to safeguard the rights of absent class members to adequate representation and in the event of dismissal or settlement. A good deal of care, and ingenuity, would be required to avoid judicial intrusion upon the merits of the dispute, or upon the conduct of the proceedings themselves and to minimize complexity, costs, or delay. (See Note, *Classwide Arbitration: Efficient Adjudication or Procedural Quagmire?* (1981) 67 Va. L.Rev. 787, 789.)

An adhesion contract is not a normal arbitration setting, however, and what is at stake is not some abstract institutional interest but the interests of the affected parties. Classwide arbitration, as Sir Winston Churchill said of democracy, must be evaluated, not in relation to some ideal but in relation to its alternatives. If the alternative in a case of this sort is to force hundreds of individual franchisees each to litigate its cause with Southland in a separate arbitral forum, then the prospect of classwide arbitration, for all its difficulties, may offer a better, more efficient, and fairer solution. Where that is so, and gross unfairness would result from the denial of opportunity to proceed on a classwide basis, then an order structuring arbitration on that basis would be justified.

Whether such an order would be justified in a case of this sort is a question appropriately left to the discretion of the trial court. In making that determination, the trial court would be called upon to consider, not only the factors normally relevant to class certification, but the special characteristics of arbitration as well, including the impact upon an arbitration proceeding of whatever court supervision might be required, and the availability of consolidation as an alternative means of assuring fairness. Whether classwide proceedings would prejudice the legitimate in-

terests of the party which drafted the adhesion agreement must also be considered, and that party should be given the option of remaining in court rather than submitting to classwide arbitration.

In this case, the trial court did not consider the franchisees' request for classwide arbitration at all, and a fortiori did not consider the factors which we have found to be relevant. Since we are unable to make the determination on this record as a matter of law, the case will be remanded to the trial court on this issue.

The order of the trial court is reversed and the cause is remanded for further proceedings consistent with the opinion herein. In light of our opinion, the petition for writ of prohibition or mandate is denied. Each party to bear their own costs.

Bird, C. J., Newman, J., and Reynoso, J.,* concurred.

**RICHARDSON, J.**—I concur with the majority's conclusions that the arbitration agreement is enforceable and that Southland did not waive its right to arbitration. I respectfully dissent, however, from the majority's further holdings that the Franchise Investment Law claims are not subject to arbitration and that class action arbitration is an available valid remedy.

## A. ARBITRABILITY OF THE FRANCHISE INVESTMENT LAW CLAIMS

Contrary to the majority, I believe that the state cannot immunize certain civil actions from application of the Federal Arbitration Act merely by fashioning, after the Federal Securities Act, a statute regulating franchise investments.

The United States Supreme Court in *Wilko v. Swan* (1953) 346 U.S. 427 [98 L.Ed. 168, 74 S.Ct. 182], held that an arbitration clause contained in a margin agreement was invalid as a forbidden "stipulation" under section 14 of the federal Securities Act of 1933. (15 U.S.C. § 77n.) In so holding, the court observed that two statutory policies were invoked: (1) the Federal Arbitration Act's emphasis on "the need for avoiding the delay and expense of litigation" (*id.*, at p. 431 [98 L.Ed. at p. 174], fn. omitted); and (2) the Securities Act's purpose to protect investors by requiring "full and fair disclosure . . . and to prevent fraud." (*Ibid.*) The high court stressed that "[w]hen the security

---

*Assigned by the Chairperson of the Judicial Council.

buyer, prior to any violation of the Securities Act, waives his right to sue in courts, he gives up more than would a participant in other business transactions. The security buyer has a wider choice of courts and venue. He thus surrenders one of the advantages the Act gives him and surrenders it at a time when he is less able to judge the weight of the handicap the Securities Act places upon his adversary." (*Id.*, at p. 435 [98 L.Ed. at pp. 175-176].) In measuring the force of the two policies, the *Wilko* court thus was required to balance two *federal* statutes, the Arbitration and the Securities Acts.

The *Wilko* court identified one important factor in the weighing process, namely, the existence of 15 United States Code section 77v, which establishes an unusually liberal venue provision for Securities Act litigation. This emphasis on venue was subsequently repeated in *Scherk* v. *Alberto-Culver Co.* (1974) 417 U.S. 506 [41 L.Ed.2d 270, 94 S.Ct. 2449], in which the high court *declined* to invalidate an arbitration clause in a controversy between foreign and domestic parties concerning an alleged violation of the 1934 Securities Exchange Act. The *Scherk* court specifically emphasized that the 1934 act's venue provision (15 U.S.C. § 78aa) "significantly restrict[s] the plaintiff's choice of forum" in contrast to section 77v, upon which the court "in particular" relied in *Wilko* v. *Swan.* (*Id.*, at p. 514 [41 L.Ed.2d at p. 278], fn. omitted.)

In contrast, the case before us concerns a *state* statute which is contrary to the *federal* law. The *Wilko* reasoning in balancing between two federal statutes of equal stature thus is not required here. Moreover, unlike the Securities Act of 1933, the state Franchise Investment Law at issue here does not contain a liberal venue provision comparable to that relied on in *Wilko.* Thus, under the California statute an investor who consents to arbitration, thereby waiving the right to sue, does *not* forego more than other similarly situated parties to routine business contracts or transactions.

No different result is mandated by section 31512 of the Corporations Code, which provides that "Any condition, stipulation or provision purporting to bind any person acquiring any franchise to waive compliance with any provisions of this law or any rule or order hereunder is void." Even if the Legislature had intended that this statute be interpreted according to the principles of *Wilko* v. *Swan,* the section nonetheless impermissibly conflicts with the Federal Arbitration Act. Section 31512 is therefore void under the supremacy clause (U.S. Const., art. VI, cl.

2) to the extent that it purports to restrict otherwise permissible arbitration in actions, as here, involving interstate commerce.

In reaching its conclusion that application of the Federal Arbitration Act here is not required, the majority wholly ignores a substantial line of very respectable authority. These cases, as I now develop, hold that in enacting the Federal Arbitration Act, Congress created *national substantive law*, which is binding on state courts even in the absence of federal jurisdiction.

In 1959, the United States Court of Appeals for the Second Circuit succinctly expressed the general principle. "We think it is reasonably clear that the Congress intended by the Arbitration Act to create *a new body of federal substantive law* affecting the validity and interpretation of arbitration agreements." (*Robert Lawrence Company* v. *Devonshire Fabrics, Inc.* (2d Cir. 1959) 271 F.2d 402, 406, cert. dism. (1960) 364 U.S. 801 [5 L.Ed.2d 37, 81 S.Ct. 27], italics added.) The *Lawrence* court observed: "To be sure much of the Act is purely procedural in character and is intended to be applicable only in the federal courts. But Section 2 declaring that arbitration agreements affecting commerce or maritime affairs are 'valid, irrevocable, and enforceable' goes beyond this point and must mean that arbitration agreements of this character, previously held by state law to be invalid, revocable, or unenforceable are now made 'valid, irrevocable, and enforceable.' *This is a declaration of national law equally applicable in state or federal courts.*" (*Id.*, at p. 407, italics added.)

The United States Supreme Court has acknowledged the *Lawrence* holding only in one instance, where it merely noted that the court of appeals in the case it was then considering had relied upon the *Lawrence* notion of "national substantive law" to hold that "a claim of fraud in the inducement of the contract generally—as opposed to the arbitration clause itself—is for the arbitrators and not for the courts . . . ." (*Prima Paint* v. *Flood & Conklin* (1967) 388 U.S. 395, 399-400 [18 L.Ed.2d 1270, 1275, 87 S.Ct. 1801].) The high tribunal then affirmed the decision below, "albeit for somewhat different reasons." (*Ibid.*) Thus the Supreme Court has never rejected the long standing doctrine that the Arbitration Act created national substantive law applicable in appropriate circumstances in state courts.

The great majority of lower federal and state courts has continued to adhere to the *Lawrence* holding. (See Annot. (1979) 95 A.L.R.3d 1145,

1151-1161.) A recent expression of this principle is contained in *In re Mercury Const. Corp.* (4th Cir. 1981) 656 F.2d 933 (en banc) (cert. granted *sub nom. Moses H. Cone Memorial Hospital* v. *Mercury Const. Corp.* (1982) 455 U.S. 937 [71 L.Ed.2d 647, 102 S.Ct. 1426]) (three questions were presented in the petition for certiorari; none specifically concerns the scope of the Arbitration Act although one involves the district court's discretion to stay its proceedings pending resolution of identical issues in a state court action involving identical parties). In discussing the application of the Federal Arbitration Act to state and federal actions the Fourth Circuit noted: "By its express language the Federal Act applies where there is '[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . .' 9 U.S.C. § 2. The constitutional validity of such an Act is found in the incontestable federal control over interstate commerce. *Prima Paint* v. *Flood & Conklin*, 388 U.S. 395, 405 . . . . The Act, however, does not include language conferring independent federal jurisdiction over an action thereunder. In order for a plaintiff to assert rights under it in a federal forum, he must establish an independent jurisdictional basis, such as diversity. [Citations.] But if, assuming diversity of the parties, the action meets the jurisdictional requirements of the Act, that action is enforceable in the state courts as well as in federal courts but *in either event it is governed by the federal substantive law developed in connection with the federal Act and not by state law. E.C. Ernst, Inc.* v. *Manhattan Const. Co.*, 551 F.2d 1026, 1040 (5th Cir. 1977) (any questions under the Act are matters of 'federal law'); *Robert Lawrence Co.* v. *Devonshire Fabrics, Inc., supra*, 271 F.2d at 406; *Pathman Const. Co.* v. *Knox County Hospital Ass'n.*, 164 Ind.App. 121, 326 N.E.2d 844, 851 (1975); *Episcopal Housing Corp.* v. *Federal Ins. Co.*, 269 S.C. 631, 636, 239 S.E.2d 647 (1977)." (*Id.*, 656 F.2d at p. 938, italics in original, fn. omitted.) As described in *Lawrence*, Congress in enacting the Arbitration Act sought to counteract the hostility of courts and judges to arbitration agreements and to "make the benefits of arbitration generally available to the business world." (271 F.2d at pp. 406-407; see *Prima Paint* v. *Flood & Conklin, supra*, 388 U.S. at p. 405 [18 L.Ed.2d at p. 1278] [Congress "plainly" had power to legislate over arbitration].)

Despite the majority's recognition of the large body of law holding that the act is applicable in state courts in appropriate cases, my colleagues seek to create, judicially, an exception for certain state regulatory practices based on some conclusion that Congress did not in-

tend to preempt the area of franchise regulation. The majority, however, fails to acknowledge that Congress has indeed preempted the field of arbitration as applied to *any* contract in interstate commerce to the extent that title 9 of the United States Code applies. No one has urged before us that there is any basis other than the state regulatory statute upon which to deny application of the Federal Arbitration Act to the contract at issue.

In addition to encouraging the enforcement of arbitration agreements, the Arbitration Act also restricts the benefits of the usually disfavored practice of forum shopping. As the majority recognizes, the likely explanation for the federal district court's remand of the action here was that complete diversity did not exist because of the presence of California defendants. Had those defendants not been named, which was, of course, well within a franchisee's power to choose, the answer would have been easy. The action could have been readily removed to the federal courts on the basis of diversity and the Arbitration Act unquestionably would have applied. It will thus be seen that the majority implicitly makes the existence or nonexistence of federal jurisdiction the determinative factor in the enforcement of the arbitration clause rather than the existence of a "transaction involving commerce . . . ." In so concluding, the majority ignores the critical distinction which exists in the Arbitration Act between the conferral of federal jurisdiction and the creation of federal substantive law applicable in state courts. This promotes forum shopping.

In a similar context, the court in *In re Mercury Const. Corp., supra,* specifically observed that, "The addition of the Architect as a party defendant might prevent removal of the state action . . . but it certainly could not frustrate Mercury's plain, indisputable right to an arbitration of *its* dispute with the Hospital." (656 F.2d at p. 942.) The Arbitration Act, construed as national substantive law binding on both federal and state courts, advances consistency.

Finally, I find it significant that sister courts which have specifically considered state statutes analogous to the one before us have found that the Arbitration Act prevails over various state attempts to limit its reach. Thus, in *Allison v. Medicab Intern., Inc.* (1979) 92 Wn.2d 199 [597 P.2d 380], the Washington Supreme Court reviewed a claim that an arbitration clause in a franchise agreement was invalid under the state's franchise act which gave to the state courts jurisdiction for causes of action based on violations of the state act. Finding that inter-

state commerce was involved, the *Allison* court rejected the argument that *Wilko* v. *Swan, supra,* 346 U.S. 427, applied to a conflict between a state franchising act and the Federal Arbitration Act. The *Allison* court instead adopted the weight of authority rule applying the federal act in the face of a contrary state law (597 P.2d, at p. 382), concluding that "the *supremacy clause of the federal constitution must prevail and thus the federal arbitration act requires enforcement of the arbitration clause in the franchise agreement despite the judicial remedies afforded by the Franchise Investment Protection Act.*" (*Id.,* at pp. 382-383, italics added.)

In similar fashion, in *Network Cinema Corporation* v. *Glassburn* (S.D.N.Y. 1973) 357 F.Supp. 169, the federal district court granted an order staying proceedings in a Kansas state court pending arbitration of a dispute between franchisor and franchisee. The Kansas court had held that the arbitration clause signed by the parties was not enforceable under state law. The federal court nonetheless found that it was empowered to stay state proceedings "when the dispute in question has been found by the federal court to be subject to the arbitration provisions of 9 U.S.C. § 2." (*Id.,* at p. 172; see also *Main* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1977) 67 Cal.App.3d 19, 23-25 [136 Cal.Rptr. 378], and cases cited therein ["'The Federal Arbitration Act, declaring arbitration agreement [*sic*] affecting [interstate] commerce or maritime affairs to be valid, enforceable, and irrevocable, is a declaration of national law equally applicable in state or federal courts'"]; *Fite & Warmath Const. Co., Inc.* v. *MYS Corp.* (Ky. 1977) 559 S.W.2d 729, 734-735.)

Finally, in *Barron* v. *Tastee-Freez Intern., Inc.* (E.D.Wis. 1980) 482 F.Supp. 1213, the federal district court considered the enforcement of an arbitration clause in the face of a state statute analogous to section 31512, which it characterized as similar to 15 United States Code section 77n. (482 F.Supp. at pp. 1215-1216.) The court felt compelled by the Federal Arbitration Act "to render void any effort made by a state to protect the remedies of the franchise investors" contrary to the federal act in cases in which the transactions related to interstate commerce. (*Id.,* at p. 1217; see also *Guinness-Harp Corp.* v. *Jos. Schlitz Brewing* (2d Cir. 1980) 613 F.2d 468, 472.) "The policy embodied in Title 9 U.S.C. . . . does not depend for its enforceability on the residence of the parties to a contract but rather on the nature of the contract." (*Barron* v. *Tastee-Freez Intern., Inc., supra,* 482 F.Supp. at p. 1217.)

The majority attempts to remove a state regulatory statute from the purview of the Federal Arbitration Act in cases involving interstate commerce. In my opinion, its chances of surviving federal review are very dubious. I believe section 31512 is void insofar as it attempts to restrict application of the federal act. Contrary to the majority's assertion, the issue is not the preemption of the field of franchise investment regulation, but rather the clear language of the federal act and the subsequent state and federal court interpretations which consistently demonstrate that the Federal Arbitration Act applies to all claims arising out of transactions in interstate commerce. "Because the United States Arbitration Act is a national substantive law that supplants state arbitration laws, *a state court is bound to apply the act* if the statutory requisites are present; . . ." (*Merrill Lynch, Pierce, Fenner, etc.* v. *Haydu* (5th Cir. 1981) 637 F.2d 391, 395, italics added.) As the majority first acknowledges and then ignores, "The franchise agreements . . . involve interstate commerce and fall within the ambit of the Federal Arbitration Act." (*Ante,* pp. 592-593.) The conclusion that the federal act must prevail is logical, consistent and supported by case law, statutory language, and congressional history. California remains one of the United States, and national substantive law must be applied by us in appropriate cases.

## B. CLASS ACTION ARBITRATION

The majority also concludes that class action arbitration may be an appropriate procedure and has remanded the case for determination by the trial court. In the absence of either statutory or contractual authority, I disagree with its holding.

Arbitration is a matter of agreement. It is consensual, being an integral part of the contract. In such situations we have said that the parties "may freely delineate the area of its application." (*O'Malley* v. *Wilshire Oil Co.* (1963) 59 Cal.2d 482, 490 [30 Cal.Rptr. 452, 381 P.2d 188]; see *Reid Burton Const.* v. *Carpenters Dist. Council, etc.* (10th Cir. 1980) 614 F.2d 698, 702, cert. den. 449 U.S. 824 [66 L.Ed. 2d 27, 101 S.Ct. 85].) As a general principle, in considering contract enforcement, "there is perhaps no higher public policy than to uphold and give effect to contracts validly entered into and legally permissible in subject matter." (*Vernon* v. *Drexel Burnham & Co.* (1975) 52 Cal. App.3d 706, 716 [125 Cal.Rptr. 147].)

In the present case, the contracts of the parties do not provide for class arbitration, nor have the parties subsequently agreed thereto. No statute authorizes a court to order arbitration on a class-wide basis. Nonetheless, the majority concludes that such a procedure is possible in order to prevent repetitive arbitration and to avoid "effectively foreclosing individual claims" in instances where the arbitration contract "may be used to insulate the drafter of an adhesion contract from any form of class proceeding." (*Ante*, p. 610.)

A recent New York case examined the propriety of the class action device used in arbitration. *Harris* v. *Shearson Hayden Stone, Inc.* (1981) 82 App.Div.2d 87 [441 N.Y.S.2d 70], weighed the policies favoring class actions and arbitration and concluded that the filing of a class action alleging a broker's breach of fiduciary duty would not permit avoidance of an agreement to arbitrate. The agreement was contained in a "customer's agreement" which the brokerage firm required all customers to sign. Citing the consistent holdings of our Courts of Appeal in *Vernon* v. *Drexel Burnham & Co., supra*, 52 Cal.App.3d 706, 716, and *Frame* v. *Merrill Lynch, Pierce, Fenner & Smith* (1971) 20 Cal.App.3d 668, 672 [97 Cal.Rptr. 811], the New York court held that "maintenance of a class action here by assertion of a claim for which a forum is provided elsewhere, would defeat the aim of arbitration, and undercut an avowed purpose of the class action itself—the 'conservation of judicial effort.'" (441 N.Y.S.2d at p. 76.)

In dissent, Justice Bloom urged that the conflict should be resolved in favor of the class action. Even he, however, expressly rejected the idea of a "class arbitration" saying, "Nor is it an answer to assert that the dispute between plaintiffs and Shearson may be proceeded with as a 'class arbitration.' Arbitration does not lend itself to the many subsidiary proceedings incident to an ongoing class action, e.g. determination of whether class action status should be granted, definition of the class, determination of the nature and kind of notice and by whom it should be sent, provision for opting out, etc. In sum, if the matter is to proceed in arbitration it must proceed as an individual claim." (*Id.*, at p. 79; cf. *Coleman* v. *National Movie-Dine, Inc.* (E.D.Pa. 1978) 449 F.Supp. 945, 948 ["Arbitration should not be foreclosed simply by adding persons to a civil action who are not parties to the arbitration agreement because such an inclusion would thwart the federal policy in favor of arbitration. (Citations.)"].) Thus in weighing the policies behind class actions and arbitration, other courts have found that class actions will not prevail where there is an individual arbitration agreement.

In addition to the concerns mentioned by Justice Bloom, other factors belie franchisees' assertion that class certification would be only a "preliminary" issue. For example, a court, in determining whether class proceedings are appropriate, must be satisfied that there is a "community of interest"; i.e., that common issues predominate over individual issues. (See Code Civ. Proc., § 382; *City of San Jose* v. *Superior Court* (1974) 12 Cal.3d 447, 459-460 [115 Cal.Rptr. 797, 525 P.2d 701, 76 A.L.R.3d 1223]; Fed. Rules Civ. Proc., rule 23, 28 U.S.C.) In determining whether a "community of interest" exists, a court must carefully evaluate the nature of the proof that will be presented by the parties (*City of San Jose, supra,* at p. 460; *Abercrombie* v. *Lum's Inc.* (S.D.Fla. 1972) 345 F.Supp. 387, 390), and the parties are likely to devote extensive resources to developing the facts and arguments fully in regard to the usually complex certification issues. (See, e.g., *Chance* v. *Superior Court* (1962) 58 Cal.2d 275, 282-287 [33 Cal.Rptr. 761, 373 P.2d 849]; *Blackie* v. *Barrack* (9th Cir. 1975) 524 F.2d 891, 900-901.)

Moreover, class action procedures would interfere with the expeditious resolution of the claims. After certification of a class, the court must notify class members of the existence of the suit so that they will have the opportunity to "opt out." (Fed. Rules Civ. Proc., rule 23(c), 28 U.S.C.) Because of the due process safeguards required to keep class members apprised of the course of the litigation, substantial judicial involvement by the court will be required to monitor the progress of the arbitration and potentially will undermine the arbitrator's discretion. In fact, the court's due process responsibilities include the duty to "undertake a stringent and continuing examination of the adequacy of representation by the named class representatives at all stages of the litigation." (*Nat. Ass'n of Regional Medical Programs, Inc.* v. *Mathews* (D.C.Cir. 1976) 551 F.2d 340, 344, cert. den. 431 U.S. 954 [53 L.Ed. 2d 270, 97 S.Ct. 2674].)

Yet another consideration arises from the fact that unlike settlements reached through arbitration, which are ordinarily not subject to court review on either procedural issues or the merits (see *Barrett* v. *Manufacturers Railway Company* (8th Cir. 1972) 453 F.2d 1305, 1307), a class action settlement normally does not become final without court approval. (*La Sala* v. *Am. S. & L. Assn.* (1971) 5 Cal.3d 864, 872 [97 Cal.Rptr. 849, 489 P.2d 1113]; Fed. Rules Civ. Proc., rule 23(e), 28 U.S.C.; *In re General Motors Corp. Engine Interchange Lit.* (7th Cir. 1979) 594 F.2d 1106, 1124, cert. den. 444 U.S. 870 [62 L.Ed.2d 95, 100 S.Ct. 146].) The court must review the entire proceedings to deter-

mine if the settlement was fair, reasonable, and adequate in light of the strength of each party's case (*Marshall* v. *Holiday Magic, Inc.* (9th Cir. 1977) 550 F.2d 1173, 1178-1179), and take evidence on any substantial objection to the proposed settlement brought by any class member. (*Mandujano* v. *Basic Vegetable Products, Inc.* (9th Cir. 1976) 541 F.2d 832, 835-836.)

Finally, the normally "informal" nature of arbitration requires no transcripts. Arbitrators generally need not explain the basis for their decision. (*Bernhardt* v. *Polygraphic Co.* (1956) 350 U.S. 198, 203-204, and fn. 4 [100 L.Ed. 199, 205-206, 76 S.Ct. 273].) The absence of a record further complicates the use of class proceedings, because without a record a court may have difficulty in applying an arbitrator's decision to all class members, since it could not determine whether the arbitrator's judgment was applicable to each member of the class, or based on equities applicable only to the individual claimant. Similarly, objections to settlements would be difficult to assess.

In addition, arbitrators, of course, are not necessarily either lawyers or judges. Requiring the administration of complex class procedures during arbitration may either make lay experts unavailable as arbitrators as a practical matter, or result in intrusive judicial participation and supervision.

In summary, class procedures would tend to make arbitration inefficient instead of efficient, lengthy instead of expeditious, and procedural instead of informal "'[A]n arbitration proceeding is, except in specified particulars, outside the court realm and jurisdiction—deliberately so taken out of the court by choice and commitment of the parties. Arbitration is subject to its own rules and practices at variance with court procedures. It is supposed to be a complete proceeding, without resort to court facilities, .... It would be generally incompatible with the nature and scope of arbitration to allow a shift to the court forum ....' (*Application of Katz*, 3 App.Div.2d 238, ....)" (*East San Bernardino County Water Dist.* v. *City of San Bernardino* (1973) 33 Cal.App.3d 942, 950 [109 Cal.Rptr. 510].)

In my view, because of the complications resulting from continued judicial monitoring, the imposition of class action procedures on the arbitration process would be self-defeating.

Nonetheless, by analogy to consolidated arbitration proceedings, the majority insists that *class arbitration* is an available remedy. However, several factors make this analogy less than compelling. In *Atlas Plastering, Inc.* v. *Superior Court* (1977) 72 Cal.App.3d 63 [140 Cal.Rptr. 59], Atlas, a general contractor, sought to consolidate arbitration proceedings between itself and several subcontractors, each of whom had entered into identical arbitration agreements with Atlas. The *Atlas* court held that, because the parties had not agreed to consolidated proceedings and because consolidation would deprive the individual subcontractors of their right to choose an arbitrator in the manner set forth in the arbitration agreement, the court lacked the power to order consolidated proceedings. (Code Civ. Proc., § 1281.6.) When *Atlas* was decided, no statute authorized a court to order consolidation of arbitrations.

Following the decision in *Atlas*, the Legislature enacted Code of Civil Procedure section 1281.3 which specifically authorizes consolidated arbitration at the court's discretion under certain circumstances. This section was relied upon in *Conejo Valley Unified School Dist.* v. *William Blurock & Partners, Inc.* (1980) 111 Cal.App.3d 983 [169 Cal. Rptr. 102], in which a party to an arbitration agreement was compelled to arbitrate his claim in consolidated proceedings despite the fact that the agreements contained conflicting provisions for choosing an arbitrator. The *Conejo* court held that section 1281.3 did not create substantive rights, but was a procedural statute and that therefore no constitutional bar to its retroactive application existed.

Unlike the *Conejo* situation, there is no state statute which permits a court to order arbitration proceedings on a class-wide basis when the contractual arrangement of the parties does not authorize it. The Legislature examined the specific problems of related arbitration proceedings when it permitted the consolidation of arbitration. After scrutinizing these problems the Legislature declined to provide for class arbitration.

Nor, as the majority concedes, is there any federal authority for class arbitration. Although federal courts have ordered consolidated arbitration under the authority of rule 42(a) of the Federal Rules of Civil Procedure, the courts have attempted to assure each party the right to select an arbitrator and to express their individual views. (See, e.g., *Compania Espanola de Pet., S.A.* v. *Nereus Ship.* (2d Cir. 1975) 527 F.2d 966, 974-975, cert. den. (1976) 426 U.S. 936 [49 L.Ed.2d 387, 96 S.Ct. 2650]; *Marine Trading Ltd.* v. *Ore Intern. Corp.* (S.D.N.Y. 1977)

432 F.Supp. 683, 685; *Robinson v. Warner* (D.R.I. 1974) 370 F.Supp. 828, 829.) In fact, the issue of the application of *consolidation* to arbitration proceedings is not a settled matter in the federal courts. (See *Gavlik Construction Co. v. H. F. Campbell Co.* (W.D.Pa. 1975) 389 F.Supp. 551, 556, revd. on other grounds (3d Cir.) 526 F.2d 777; see also *Robinson v. Warner, supra,* 370 F.Supp. at p. 830.)

In the absence of a statute authorizing class arbitration or agreement of the parties, it is inappropriate in my view for us, judicially, to superimpose such a procedure on the arbitration process over objections of a party to the contract. (Compare, *Stevenson v. Com., Dept. of Revenue* (1980) 489 Pa. 1 [413 A.2d 667] [the Pennsylvania Board of Arbitration of Claims Act specifically incorporates procedures embodied in rules of Pennsylvania civil procedure and class action is therefore available to parties appearing before board].)

The majority is compelled to acknowledge that class-wide arbitration "would entail a greater degree of judicial involvement than is normally associated with arbitration . . . ." (*Ante,* p. 613.) Nonetheless, it argues that if the alternative would be to require hundreds of individual arbitration proceedings, then such a procedure may be appropriate. I believe, however, that the majority fails to accord proper deference to the recognized principle that arbitration is a *favored* means of dispute resolution because it permits a *nonjudicial, informal,* and *speedy* alternative to litigation. (See, e.g., *Taylor v. Crane* (1979) 24 Cal.3d 442, 452 [155 Cal.Rptr. 695, 595 P.2d 129]; *Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 189 [151 Cal.Rptr. 837, 588 P.2d 1261]; *Aerojet-General Corp. v. American Arbitration Assn.* (9th Cir. 1973) 478 F.2d 248, 251.) The injection of class action procedure into the arbitration process *in the absence of either statutory authority or contractual agreement* conflicts with these settled principles as well as with the specific contract terms to which the parties agreed. "It is axiomatic that commercial arbitration is to be based on a voluntary agreement of the parties[;] only then can the concept of arbitration be well understood. In other words, nobody should be bound to resort to arbitration unless he has previously agreed to that method of dispute settlement." (Domke on Commercial Arbitration (1968) § 1.02, p. 5.)

The franchisees here do not contend that they would be unable to proceed individually in separate or consolidated arbitration proceedings. We are not confronted with a situation in which a plaintiff contends that it would be economically unfeasible to mount a challenge in the

absence of a class proceeding. In fact, not all of the actions before us have been brought as class actions. It is very clear that the individual franchisees have been fully able to proceed.

In a case where class proceedings provide the only economical method of presenting a claim, an alternative exists which would protect both the contractual integrity of proper arbitration agreements and the interests of individual claimants. One solution which has been suggested, and which the majority rejects, "would be to hold that arbitration agreements contained in contracts of adhesion may not operate to stay properly maintainable class actions." (*Ante,* p. 610.) I agree that as a general rule such a holding would be contrary to the basic arbitration agreement of the parties and to the policy favoring arbitration. There is, however, another alternative. Under settled principles of law, arbitration clauses in adhesion contracts may be declared invalid where they are "beyond the reasonable expectations of an ordinary person ..." (*Wheeler* v. *St. Joseph Hospital* (1976) 63 Cal.App.3d 345, 357 [133 Cal.Rptr. 775, 84 A.L.R.3d 343]) or bear oppressively on the weaker party. (*Madden* v. *Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 710 [131 Cal.Rptr. 882, 552 P.2d 1178]; *Graham* v. *Scissor-Tail, Inc.* (1981) 28 Cal.3d 807, 820 [171 Cal.Rptr. 604, 623 P.2d 165].) Thus, where an arbitration clause in an adhesion contract would allow the stronger party to evade responsibility for its acts, such a clause may, under those facts, be found oppressive and the clause invalidated. In instances where an arbitration clause would effectively deny relief to the weaker party in an adhesion contract, relief under settled principles of law would potentially be available. As the majority concludes, there is no such evasion of liability here, and consequently, there is no need for an extraordinary remedy such as the one proposed by the majority.

In summary, the majority, in the absence of any contractual, statutory, or judicial authority or any demonstrated need, has seen fit to invent a procedure which is fundamentally contrary to the purpose of arbitration and to the public policy encouraging arbitration. Potentially, the majority's holding will effectively render arbitration clauses in all adhesion contracts subject to class treatment, thus engrafting on an informal, speedy method of dispute resolution which often utilizes non-legal arbitrators a complex legal procedure which will require close court supervision and frequent intervention antithetical to the essential informal and nonjudicial nature of the arbitration process.

CONCLUSION

From the foregoing, I conclude that the trial court erred in holding that the Franchise Investment Law claims were not arbitrable in the face of the clear national substantive law to the contrary. I would reverse the trial court judgment to the extent that it denies arbitration of these claims. In addition, I conclude that in the absence of any statutory or contractual agreement to the contrary, the strong policy reasons favoring arbitration as a speedy, informal, and nonjudicial method of dispute resolution militate against the remand of this case to the trial court to permit it to determine whether class arbitration may be an appropriate procedure. I would affirm the trial court's order referring the individual cases to arbitration, recognizing that *consolidation* of the individual arbitrations might be proper.

Mosk, J., concurred.